IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CV-654-D

| | | |
|---|---|---|
| LINDA W. COLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

On December 15, 2015, Linda W. Coleman ("plaintiff" or "Linda"), having exhausted her available administrative remedies, brought this action under 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA") to recover benefits allegedly owed to her under an accidental death and dismemberment policy [D.E. 1]. On January 29, 2016, Metropolitan Life Insurance Company ("MetLife") answered the complaint [D.E. 15]. On February 22, 2016, Linda amended her complaint [D.E. 18]. On March 7, 2016, MetLife answered [D.E. 19].

On September 30, 2016, MetLife moved for summary judgment [D.E. 24], filed an affidavit attaching the administrative record [D.E. 25], and filed a supporting memorandum [D.E. 26]. Likewise, on September 30, 2016, Linda moved for summary judgment [D.E. 27] and filed a supporting memorandum [D.E. 28]. The parties responded to each other's motions [D.E. 30, 31] and replied to those responses [D.E. 33, 34]. As explained below, the court grants Linda's motion for summary judgment, denies MetLife's motion for summary judgment, and awards plaintiff the benefits due under the policy.

In December 2014, Linda's 86-year-old husband ("Mr. Coleman") resided at a hospice-care facility. [D.E. 25-3] 63; Administrative Record ("AR") 163. He suffered from severe dementia, significant anemia, stage-4 prostate cancer with bone metastasis, and other ailments. [D.E. 25-3] 65, 67, 69–70; AR 165, 167, 169–70. He had completed chemotherapy in March 2014, but his health had continued to decline. [D.E. 25-3] 65; AR 165. "Do Not Resuscitate" instructions were in place. [D.E. 25-3] 63, 67; AR 163, 167.

Mr. Coleman had poor mobility and was supposed to use a wheelchair. [D.E. 25-3] 63, 65, 70; AR 163, 165, 170. On December 9, 2014, Mr. Coleman fell at his hospice-care facility. [D.E. 25-3] 63, 65; AR 163, 165. At the hospital, he was diagnosed with a hematoma and laceration on his forehead but did not suffer any intracranial damage. [D.E. 25-3] 63, 76–77; AR 163, 176–77. Imaging revealed a fracture to his left femur. [D.E. 25-3] 46, 63, 69; AR 146, 163, 169. Mr. Coleman was admitted to the hospital for the femur fracture. [D.E. 25-3] 65; AR 165.

The treating physician determined that Mr. Coleman "was not a surgical candidate due to his multiple comorbidities," "poor potential for healing," and "high potential for complications." [D.E. 25-3] 65, AR 165; see [D.E. 25-3] 70; AR 170. As a result, Mr. Coleman was admitted for palliative care and made comfortable. [D.E. 25-3] 65, 67; AR 165, 167. Linda agreed that staff would not perform any additional procedures, testing, blood transfusions, or "any aggressive interventions." [D.E. 25-3] 67; AR 167; see [D.E. 25-3] 63; AR 163. The treating physician opined that Mr. Coleman would likely "require 2-3 nights for acute pain management." [D.E. 25-3] 67; AR 167.

Around 10:30 or 11 p.m., Mr. Coleman "got acutely agitated and clinically started declining." [D.E. 25-3] 63; AR 163. He died in the early hours of December 10, 2014. Id.; [D.E. 25-3] 5; AR 105.

Sara Abbott, M.D., completed Mr. Coleman's death certificate on December 10, 2014. [D.E. 25-3] 5; AR 105. She entered "accident" as the "manner of death" and made two causation-related findings. Id. She concluded that "complications of blunt force/head and hip injuries" were the "immediate cause (final disease or condition resulting in death)." Id. She listed "metastatic prostate cancer" under "other significant conditions contributing to death." Id. The following day Dr. Abbott completed an in-depth Report of Investigation, which, unlike the death certificate, listed no contributing causes in the space provided for listing them. [D.E. 25-3] 118; AR 218.

At the time of his death, Mr. Coleman was a retired employee of Morgan Stanley. As a participant in Morgan Stanley's Employee Benefit Plan, Mr. Coleman was insured under an accidental death and dismemberment ("AD&D") policy. See Am. Compl. [D.E. 18] ¶ 6; Answer [D.E. 19] ¶ 6. The AD&D policy provides financial protection if the employee was seriously injured in an accident and suffered "dismemberment, paralysis, loss of sight, speech or hearing or loss of life." [D.E. 25-1] 104; AR 528. The AD&D policy covers all accidents except those listed as exclusions. Id. In relevant part, the exclusions provide that:

No payment will be made for any Loss if it results from or is caused or contributed to by:

\* \* \*

• Sickness, disease, bodily or mental infirmity or medical or surgical treatment, bacterial or viral infection, regardless of how contracted. This does not include bacterial infection that is the natural and foreseeable result of an accidental external bodily injury or accidental food poisoning.

Note: These are accident-only policies. The Basic and AD&D Insurance Plans do not pay benefits for losses caused by or resulting from illness, disease or bodily infirmity, as determined by MetLife.

[D.E. 25-1] 108–09; AR 532–33.

3

MetLife acts as both the reviewer and administrator of AD&D claims. [D.E. 25-1] 148, 164;

AR 572, 588. If covered, a death resulting from an accident requires MetLife to pay Mr. Coleman's

beneficiary—Linda—$1,050,000.00. [D.E. 25-3] 323, 325; AR 423, 425.

On December 22, 2014, Linda submitted a claim with MetLife. [D.E. 25-3] 2–3; AR 102–03.

On December 23, 2014, MetLife acknowledged Linda's claim and asked Linda to send additional

documentation so it could determine whether she was entitled to AD&D benefits. [D.E. 25-3] 10;

AR 110. Linda sent MetLife the requested information. See [D.E. 25-3] 7–9; AR 107–09.

On March 24, 2015, MetLife notified Linda that it would deny her claim. [D.E. 25-3] 85–87;

AR 185–87 ("First Denial Letter"). After quoting portions of the AD&D coverage provisions, the

First Denial Letter stated:

> The Plan further states on pages 106–107:
>
>> No payment will be made for any Loss if it results from or is caused
>> or contributed to by:
>> * Sickness, disease, bodily or mental infirmity or medical or
>>   surgical treatment, bacterial or viral infection, regardless of
>>   how contracted. This does not include bacterial infection that
>>   is the natural and foreseeable result of an accidental eternal
>>   bodily injury or accidental food poisoning.
>
> According to our records, the Certificate of Death issued in the State of North
> Carolina for William Coleman states his cause of death as "Complications of blunt
> force/head and hip injuries" and his manner of death as "Accident." The death
> certificate lists metastatic prostate cancer as a contributing condition. According to
> the WakeMed Cary Emergency Services William had gotten up to use the bathroom
> however was not using his wheelchair and fell. William had prostate cancer with
> bone metastasis. As a medical condition contributed to the death, Accidental Death
> benefits are not covered under the terms of the Plan.
>
> Therefore, based on the record before MetLife, we must deny your claim. Under
> ERISA, you have the right to appeal this decision within sixty (60) days after the
> receipt of this letter.

[D.E. 25-3] 86; AR 186.

4

After receiving the First Denial Letter, Linda, through counsel, requested and received an extension of time within which to appeal the decision. See [D.E. 25-3] 104; AR 204. On June 29, 2015, Linda filed her appeal. [D.E. 25-3] 107–09; AR 207–09. Linda contended that:

> MetLife improperly considered [Mr. Coleman's] metastatic prostate cancer as a contributing cause of death under the above accidental death policy. The governing legal standard applied by courts for evaluating whether a preexisting illness may preclude coverage under an accidental death policy is as follows:
>
> > [A] pre-existing infirmity or disease is not to be considered as a cause unless it substantially contributed to the disability or loss . . . . [A] 'predisposition' or 'susceptibility' to injury, whether it results from congenital weakness or from previous illness or injury, does not necessarily amount to a substantial contributing cause. A mere 'relationship' of undetermined degree is not enough. *Adkins v Reliance Standard Life Ins Co*, 917 F.2d 794, 797 (4th Cir. 1990) (quoting *Colonial Life & Acc Ins Co v Weartz*, 636 S.W.2d 891, 894 (Ky. Ct App 1982) (emphasis added)[).]

[D.E. 25-3] 107; AR 207. Although the death certificate listed "metastatic prostate cancer" under "other significant conditions contributing to death," Linda contended that "there is no indication that Mr. Coleman's cancer substantially contributed to his death on December 10 as required by the applicable legal standard." [D.E. 25-3] 108; AR 208. Linda argued that "[t]he listing of Mr. Coleman's metastatic prostate cancer on the Certificate of Death shows only a mere relationship of undermined degree which does not satisfy the legal standard applicable to accidental death benefits." Id. (quotation omitted).

Linda's appeal included a "Report of Investigation" that Dr. Abbott completed on December 11, 2014. [D.E. 25-3] 118; AR 218. It lists the "probable cause of death" as "complications of blunt force head and hip injuries due to fall from standing." Id. But unlike the death certificate, it lists no contributing causes in the space provided to list them. Id. Linda's appeal also recounted a telephone conversation between Linda's counsel and Dr. Abbott in which Dr. Abbott said:

5

- In her medical opinion, "Mr. Coleman would not have died at the time he did but for the accidental fall and traumatic injuries he suffered as a result."

- She listed "'complications of blunt force head and hip injuries' as the 'Immediate Cause' of death" on the death certificate "because Mr. Coleman's injuries from the accidental fall were the immediately precipitating event or condition causing his death."

- She listed "metastatic prostate cancer" in the box labeled "other significant conditions contributing to death" "only because decreased mobility due to prostate cancer may have contributed to Mr. Coleman's accidental fall; however, the prostate cancer was not the 'Immediate Cause' of death."

Id. (emphasis in original). Linda requested that "MetLife review its denial of coverage under the applicable legal standard." [D.E. 25-3] 109; AR 209.

On appeal, MetLife sought the opinions of Derrick Bailey, M.D., one of MetLife's in-house doctors. [D.E. 25-3] 274–75; AR 374–75.[1] The questionnaire solicited the following responses from Dr. Bailey:

#2: Can you, within a reasonable degree of medical certainty, determine whether an otherwise healthy person would have died from the injuries sustained in the fall? [ ]YES [ ]NO

It seems unlikely that an otherwise healthy person would have died from the fall. The insured had a fall from standing in which he may have struck his head and sustained a fracture of his left femur. Femur fractures from such an injury usually happen only in older individuals or those with bone disease such as osteoporosis (more common on older individuals). Injuries of this kind are associated with significant morbidity and mortality because they tend to occur in less healthy and hearty individuals. The insured did not have a significant intracranial injury from this fall though he had evidence of prior strokes. Besides being of advanced age with evidence of strokes in the past the insured also had metastatic prostatic cancer making him even more susceptible to unfavorable outcome in case of an adverse event (such as the fall).

---

[1]Although Dr. Bailey used an "@metlife.com" e-mail address, the administrative record does not explicitly state that Dr. Bailey was an in-house doctor for MetLife. See [D.E. 25-3] 277; AR 377. MetLife acknowledges in its briefing that Dr. Bailey was an in-house physician for MetLife. See [D.E. 30] 6.

6

#3: Can you, within a reasonable degree of medical certainty, determine whether the loss was caused by an illness? [ ]YES [ ]NO

The insured's underlying condition very likely contributed to the outcome, compounding the insult to the fall.

#4: As the medical records provided show that the insured had a medical condition, to a reasonable degree of medical certainty, can you determine whether this medical condition caused or contributed to the death? [ ]YES [ ]NO

It is likely the medical condition contributed to the outcome as noted above.

#5: In your medical opinion, can you determine whether or not an otherwise healthy person would have passed away from the fall that the decedent suffered? [ ] Yes [ ] No

It is unlikely that an otherwise healthy person would have passed away from the injury of a fracture of the proximal femur.

[D.E. 25-3] 277–78; AR 377–78 (citation omitted).

In summarizing the details of the claim on appeal, MetLife's analyst stated that Linda's attorney "cites some case law but they appear to be state cases, not federal; this is an ERISA regulated benefit" and that in Dr. Bailey's opinion Mr. Coleman's "medical conditions contributed to his death." [D.E. 25-3] 280; AR 380.

On August 7, 2015, MetLife notified Linda by letter that it had considered her appeal and concluded that it had properly denied the claim. [D.E. 25-3] 283–85; AR 383–85 ("Second Denial Letter"). In relevant part, the Second Denial Letter stated:

As described above and in the initial denial letter, our records indicate that the Certificate of Death that was issued in the State of North Carolina for William Coleman states his cause of death as "Complications of blunt force/head and hip injuries" and his manner of death as "Accident." The death certificate lists metastatic prostate cancer as a contributing condition. According to the WakeMed Cary Emergency Services William had gotten up to use the bathroom however was not using his wheelchair and fell. William had prostate cancer with bone metastasis. As a medical condition contributed to the death, Accidental Death benefits are not covered under the terms of the Plan.

In your letter dated June 29, 2015 you are appealing our denial. You are first appealing on the basis of the outcome of case law Adkins v. Reliance Standard Life Ins. Co., 917 F.2d 794 (4th Cir. 1990) stating a pre-existing infirmity or disease is not to be considered as a cause unless it substantially contributed to the disability or loss. You are stating without William's fall on December 9th, he would not have died on December 10th.

You are also appealing on the basis of Dr. Sara Abbott's Report of Investigation. Dr. Abbott stated she listed complications of blunt force head and hip injuries as the immediate cause of death because the injuries form [sic] the accidental fall were the immediate precipitating event or condition causing his death. She then listed metastatic prostate cancer as a significant condition because decreased mobility due to prostate cancer may have contributed to William's accidental fall but was not the immediate cause of death.

Our decision remains unchanged. As stated above, the exclusion would apply since the death was caused or contributed to by prostate cancer as verified by Dr. Abbott. Without William's underlying illness (prostate cancer with bone metastasis), an otherwise healthy person would not have succumbed to the injuries that William sustained that ultimately lead to his death.

Therefore, based on the record before MetLife, we must uphold the denial of the claim.

[D.E. 25-3] 284-85; AR 384-85.

On September 8, 2015, Linda's attorney requested that MetLife reconsider its denial. [D.E. 25-3] 287; AR 387. Linda attached an affidavit from Dr. Abbott that in relevant part stated:

10. I completed the "Medical Certification" portion of the Certificate of Death for Mr. Coleman and made the following notations on the Certificate of Death:

a. Box 23, Part I: I listed the "Immediate Cause" of death as "complications of blunt force head and hip injuries." "Immediate Cause" is the immediately precipitating event or condition causing death. Mr. Coleman suffered from an accidental fall (from standing to ground) on December 9, 2014, and his injuries from the accidental fall were the "Immediate Cause" of death on December 10, 2014.

b. Box 23, Part U: I listed "metastatic prostate cancer" as an "other significant condition[] contributing to death." Mr. Coleman was a patient of prostate cancer and was receiving end-of-life care at the time of his accidental fall. I listed "metastatic prostate cancer" in this box only because decreased mobility and/or general deconditioned status due to the prostate cancer may

have contributed to the accidental fall; however, the prostate cancer was not the "Immediate Cause" as stated above in paragraph 10.a. Mr. Coleman died from the injuries caused by the fall, not from his cancer.

c.  Box 25: I checked the box for "Accident" as the "Manner of Death" because Mr. Coleman's death was not Natural (or caused by disease).

\* \* \*

13. In my medical opinion, which I hold to a reasonable degree of medical certainty, Mr. Coleman would not have died at the time he did but for the accidental fall and traumatic injuries suffered as a result.

[D.E. 25-3] 289–90; AR 389–90.

On October 16, 2015, MetLife notified Linda's attorney that it had reviewed Dr. Abbott's

affidavit and affirmed its denial. [D.E. 25-3] 302–05; AR 402–05 ("Third Denial Letter"). The

Third Denial Letter stated in relevant part that:

William Coleman had prostate cancer with bone metastasis and was under hospice care. While Mr. Coleman was not confined to his bed under hospice care, he did not have the mobility needed to walk. As Mr. Coleman did have prostate cancer and was being treated for this disease, he was more susceptible to weakness in regards to mobility, which would contribute to his fall.

Dr. Sarah Abbot [sic] also confirms that []the prostate cancer may have contributed to the accidental fall; however, the prostate cancer was not the 'Immediate Cause'. Based on the Plan, as referenced above, accidental death benefits are not payable if a sickness, disease, bodily or mental infirmity caused or contributed to the loss. In her statement, Dr. Sarah Abbot [sic] confirmed that while the cancer was not the immediate cause of the loss, it did contribute to the fall and to the passing of the decedent. As a result, the above-referenced Plan exclusion applies.

The Accidental Loss is not covered, as the loss was the result of a disease: prostate cancer. Without Mr. Coleman's underlying disease (prostate cancer with bone metastasis), an otherwise healthy person would not have succumbed to the injuries that Mr. Coleman sustained (from his fall), that ultimately lead to his death.

Therefore, based on the record before MetLife, we must uphold the denial of the claim.

[D.E. 25-3] 304–05; AR 404–05. The Third Denial Letter also stated that MetLife had "obtained

an independent expert medical opinion on the claim." [D.E. 25-3] 304; AR 404.

Having exhausted her available administrative remedies, Linda brought this ERISA action to recover the benefits allegedly due under the AD&D policy. Am. Compl. ¶¶ 21–22. The parties have filed cross motions for summary judgment [D.E. 24, 27].

## II.

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment must initially show an absence of a genuine dispute of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If a moving party meets its burden, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation and emphasis omitted). A genuine issue for trial exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that might affect the outcome under substantive law preclude summary judgment. Anderson, 477 U.S. at 248. In reviewing the factual record, the court views the facts in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. Matsushita, 475 U.S. at 587–88. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond

v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

III.

A court reviewing a denial of benefits under an ERISA-regulated policy does so "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); see Johnson v. Am. United Life Ins. Co., 716 F.3d 813, 819 (4th Cir. 2013). "If such discretionary authority is conferred, the courts' review is for abuse of discretion." Johnson, 716 F.3d at 819 (quotation omitted).

The parties agree that the court should review MetLife's denial for abuse of discretion based on the Plan's language:

> In carrying out their respective responsibilities under the Plans, the Plan Administrator and other of the Plans' fiduciaries shall have discretionary authority to make any findings necessary or appropriate for any purpose under the Plans, including, to interpret the terms of the Plans and to determine eligibility for and entitlement to benefits under the Plans. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the determination was arbitrary and capricious.

[D.E. 25-1] 165; AR 589; see [D.E. 25-1] 148; AR 572. Although the Plan references an arbitrary-and-capricious standard of review that is more deferential than the abuse-of-discretion standard, a plan's language cannot alter the standard of review that applies to ERISA claims. See Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 343 (4th Cir. 2000). Thus, notwithstanding the Plan's "arbitrary and capricious" language, the court still reviews MetLife's denial of benefits for abuse of discretion. Id.

Under the abuse-of-discretion standard, the court should uphold the plan administrator's decision if the decision was reasonable; if not, the court will reverse. See, e.g., Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 322 (4th Cir. 2008). An administrator's decision was

reasonable if it resulted from a deliberate, principled reasoning process and was supported by substantial evidence. See, e.g., Solomon v. Bert Bell/Pete Rozelle NFL Player Retirement Plan, No. 16-1730, 2017 WL 2695191, at *4 (4th Cir. June 23, 2017); Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15, 21 (4th Cir. 2014); DuPerry v. Life Ins. Co. of N. Am., 632 F.3d 860, 869 (4th Cir. 2011). The administrator's decision must "rest on good evidence and sound reasoning" and "result from a fair and searching process." Harrison, 773 F.3d at 21; see Evans, 514 F.3d at 322–23. Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." DuPerry, 632 F.3d at 869; see Jani v. Bell, 209 F. App'x 305, 314 (4th Cir. 2006) (unpublished). The court may consider only that evidence known to the administrator when it rendered its decision. Helton v. AT&T Inc., 709 F.3d 343, 352 (4th Cir. 2013).

The Fourth Circuit has identified eight nonexclusive factors that guide the court's abuse-of-discretion review under ERISA:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Id. at 353 (quotation omitted); see DuPerry, 632 F.3d at 869. Not every factor is relevant in every case. Helton, 709 F.3d at 357. Yet one factor is of particular importance here. This case implicates an external legal standard that governed (or was supposed to have governed) MetLife's determination of whether the AD&D policy covered Mr. Coleman's death. MetLife denied coverage under an exclusion providing that "No payment will be made for any Loss if it results from or is caused or contributed to by . . . sickness, disease, bodily or mental infirmity." [D.E. 25-1] 108–09;

AR 532–33. The Fourth Circuit has addressed when a preexisting infirmity or disease triggers causation-based exclusions under AD&D policies:

> A pre-existing infirmity or disease is not to be considered as a cause unless it substantially contributed to the disability or loss. . . . A "pre-disposition" or "susceptibility" to injury, whether it results from congenital weakness or from previous illness or injury, does not necessarily amount to a substantial contributing cause. A mere "relationship" of undetermined degree is not enough.

Adkins v. Reliance Standard Life Ins. Co., 917 F.2d 794, 797 (4th Cir. 1990) (alteration and quotation omitted) (alterations in original). The Adkins standard governs even where, as here, the causation-based exclusion simply says "caused or contributed to," and it requires that any contribution be substantial. See Hall v. Metro. Life Ins. Co., 259 F. App'x 589, 590–91, 595 (4th Cir. 2007) (unpublished) (applying Adkins to an insurance policy excluding coverage for accidental-death benefits when the loss was "contributed to or caused by" disease or physical impairment); O'Dell v. Zurich Am. Ins. Co., No. 2:13-12894, 2015 WL 5724376, at *22 n.14 (S.D. W. Va. Sept. 29, 2015) (unpublished). The Adkins "test requires a two-step determination: first, whether there is a pre-existing disease, pre-disposition, or susceptibility to injury; and, second, whether this pre-existing condition, pre-disposition, or susceptibility substantially contributed to the disability or loss." Quesinberry Life Ins. Co. of N. Am. v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1028 (4th Cir. 1993) (en banc); see Hall, 259 F. App'x at 595.

In Adkins, the insurer argued that coverage does not exist if the loss would not have occurred "but for" the preexisting condition or "if the [accidental] injury cooperated with a preexisting disease or bodily infirmity." Adkins, 917 F.2d at 796. Under this formulation, "a claimant would have to be in perfect health at the time of his most recent injury before the policy would benefit him, and that, of course, is a condition hardly obtained, however devoutly to be wished." Id. The insured in Adkins argued for "a but for rule to the covered risk so that the triggering of a disabling condition

13

by accident might authorize recovery whatever the previous condition might be." Id. at 797. In Adkins, the Fourth Circuit rejected these two options in favor of the middle ground offered by the substantial-contribution test. Id.

Under ERISA, the insured bears the burden of establishing that a covered loss has occurred, and the insurer has the burden of proving that an exclusion applies. See Jenkins v. Montgomery Indus., Inc., 77 F.3d 740, 743 (4th Cir. 1996); Bernstein v. CapitalCare, Inc., 70 F.3d 783, 790 (4th Cir. 1995); Ferguson v. United of Omaha Life Ins. Co., 3 F. Supp. 3d 474, 481 (D. Md. 2014).

Linda contends that Mr. Coleman's accidental death triggered coverage under the AD&D policy. [D.E. 28] 14. The policy itself makes it easy for Linda to carry her burden: "all accidents are covered except those outlined in the *Exclusions* sections," [D.E. 25-1] 104; AR 528, and the death certificate lists "accident" as the cause of death. [D.E. 25-3] 5, AR 105. MetLife does not contend that Linda failed to carry her burden of proving that a covered loss occurred, and MetLife acknowledges it must prove that the exclusion prevents Linda from recovering AD&D benefits. [D.E. 30] 3.

IV.

Turning to whether MetLife abused its discretion, the most relevant factors here are the adequacy of the materials considered to make the decision and the degree to which they support it, whether the decisionmaking process was reasoned and principled, any external standard relevant to the exercise of discretion, and MetLife's motives and any conflict of interest.

A.

The inquiry into the adequacy of the record and the degree to which it supports MetLife's decision encompasses two requirements. First, it requires that the administrator compile an adequate record upon which to base its decision. See Helton, 709 F.3d at 358. Second, the record must

14

provide substantial evidence in support of the administrator's decision. See id. at 359. The adequacy of the record is not at issue here. Linda does not contend that the record is wholly inadequate on its face. See, e.g., id. at 354 n.4. The relevant records MetLife relies upon as adequate for supporting its denial are the death certificate, medical examiner's report, medical records from Mr. Coleman's hospitalization following the accident, Dr. Bailey's opinion, Dr. Abbott's affidavit, and the letters from the review process. [D.E. 26] 15. The key question focuses on whether they support MetLife's decision; that is, accounting for the Adkins test and the evidentiary-support requirements, whether these materials provide substantial evidence that Mr. Coleman's cancer substantially contributed to his death.

MetLife asserts that the following constitutes substantial evidence that Mr. Coleman's cancer substantially contributed to his death:

- His death certificate listed "metastatic prostate cancer" under "other significant conditions contributing to death," [D.E. 26] 14;

- The doctor's described Mr. Coleman's status as "end-of-life" and advised against surgery or other curative measures due to his "multiple comorbidities," id.;

- Mr. Coleman had a "do not resuscitate" order in place, id.;

- Dr. Bailey's conclusion that it was "unlikely that the injuries sustained by Mr. Coleman in his fall would have resulted in death in an otherwise healthy individual," id.;

- Dr. Bailey's conclusion that Mr. Coleman's medical condition "contributed to the outcome," id.;

- Dr. Abbott's acknowledgment of Mr. Coleman's "end-of-life care" and "decreased mobility and/or general deconditioned status," [D.E. 30] 5;

- The severity of Mr. Coleman's cancer speaks for itself as establishing the requisite causal link, id.;

- Mr. Coleman had "severely poor bone stock, id. at 12;

15

- Mr. Coleman was "frail" and "with jaundice," id.

- Mr. Coleman "suffered from severe dementia, and had a history of significant anemia and three cardiovascular events," [D.E. 33] 3; and

- Mr. Coleman was in hospice care. Id.

These contentions fall into three evidentiary categories: the death certificate, Dr. Bailey's report, and Mr. Coleman's ill health generally.

1.

MetLife's contends that the death certificate supplies substantial evidence that the cancer substantially contributed to Mr. Coleman's death without reference to any other evidence. [D.E. 30] 2. MetLife emphasizes that the certificate listed "metastatic prostate cancer" under "other significant conditions contributing to death." MetLife's position, however, ignores Dr. Abbott's affidavit.

In her sworn affidavit, Dr. Abbott stated she had "listed 'metastatic prostate cancer' in this box only because decreased mobility and/or general deconditioned status due to the prostate cancer may have contributed to the accidental fall." [D.E. 25-3] 289–90; AR 389–90 (emphasis added). Thus, Dr. Abbott explained that the death certificate did not reflect the conclusion that Mr. Coleman's cancer contributed to his death, but instead only that it may have contributed to his fall. The death certificate as explained by Dr. Abbott therefore provides no evidence that Mr. Coleman's cancer contributed to his death, much less to a substantial degree. In light of Dr. Abbott's clarification of the language invoked by MetLife, it was unreasonable for MetLife to continue relying on the death certificate as sufficient in and of itself to establish that Mr. Coleman's cancer substantially contributed to his death. Cf. Jani, 209 F. App'x at 314 ("Similarly, a plan fiduciary abuses its discretion by crediting a doctor's earlier, incomplete evaluation but ignoring the same doctor's later, more comprehensive opinion."); Donovan v. Eaton Corp., Long Term Disability Plan,

16

462 F.3d 321, 329 (4th Cir. 2006) (affirming a district court's holding that an insurer had acted unreasonably when the insurer based its decision on a doctor's earlier incomplete findings and ignored later, more complete findings). Moreover, at least one court applying the substantial-contribution test has rejected an insurer's argument that the examiner's listing of the preexisting illness on an identically phrased death certificate was enough to establish substantial contribution. See Towers ex rel. Verderosa v. Life Ins. Co. of N. Am., No. 6:09-CV-1318-ORL-28, 2011 WL 3752734, at *5 (M.D. Fla. Aug. 25, 2011) (unpublished).

Although MetLife now says that Dr. Abbott's affidavit merely reflects Dr. Abbott's opinion, [D.E. 30] 5, MetLife did not initially question Dr. Abbott's reasoning and instead listed it in its Third Denial Letter as a basis for denying Linda's claim. [D.E. 25-3] 304–05; AR 404–05. Yet the exclusion requires that the "Loss," not the accident, be caused or contributed to by the preexisting condition. [D.E. 25-1] 108–08; AR 532–33. That Mr. Coleman's cancer may have contributed to the accident is irrelevant to his coverage under the AD&D policy. See, e.g., Ferguson, 3 F. Supp. 3d at 482–87.

2.

MetLife also cites Dr. Bailey's answers given in response to a questionnaire sent to him during the appeals process. According to MetLife, these opinions support the conclusion that Mr. Coleman's cancer substantially contributed to his death.

Linda attacks Dr. Bailey's opinions as speculative and ambiguous. She relies principally on the Adkins court's declaration that "a 'pre-disposition' or 'susceptibility' to injury, whether it results from congenital weakness or from previous illness or injury, does not necessarily amount to a substantial contributing cause. A mere 'relationship' of undetermined degree is not enough." Adkins, 917 F.2d at 797. The court agrees with Linda's argument.

17

Dr. Bailey's "opinion focuses primarily on increased susceptibility due to age and does not specify the degree, if any, to which the cancer may have contributed to the effects of age." [D.E. 28] 20. Asked the question, "Can you, within a reasonable degree of medical certainty, determine whether an otherwise healthy person would have died from the injuries sustained in the fall?" Dr. Bailey responded:

> It seems unlikely that an otherwise healthy person would have died from the fall. The insured had a fall from standing in which he may have struck his head and sustained a fracture of his left femur. Femur fractures from such an injury usually happen only in older individuals or those with bone disease such as osteoporosis (more common on older individuals). Injuries of this kind are associated with significant morbidity and mortality because they tend to occur in less healthy and hearty individuals. The insured did not have a significant intracranial injury from this fall though he had evidence of prior strokes. Besides being of advanced age with evidence of strokes in the past the insured also had metastatic prostatic cancer making him even more susceptible to unfavorable outcome in case of an adverse event (such as the fall).

[D.E. 25-3] 277–78; AR 377–78 (emphasis added) (citation omitted). This opinion does not identify any causal link between the cancer and Mr. Coleman's death. Both this opinion and Dr. Bailey's remaining conclusions say, at most, that people with cancer are more susceptible to unfavorable outcomes following hip fractures and that there was a "mere relationship of undetermined degree" between Mr. Coleman's cancer and his death. Dr. Bailey's statement that "[t]he insured's underlying condition very likely contributed to the outcome, compounding the insult to the fall" says nothing of the degree of contribution. The same conclusion applies to Dr. Bailey's statement that "[i]t is unlikely that an otherwise healthy person would have passed away from the injury of a fracture of the proximal femur." Dr. Bailey's statements provide no basis from which MetLife could have reasonably concluded that Mr. Coleman's cancer substantially contributed to his death.

Dr. Bailey relied upon a conclusion that, as a sick person, Mr. Coleman was susceptible to negative health outcomes, as well as facts suggesting a correlation between Mr. Coleman's illness

18

and his death. He did not make any findings showing causation to a quantified or substantial degree. Therefore, Dr. Bailey's opinion does not provide a rational basis for MetLife's denial, which required finding that Mr. Coleman's cancer substantially contributed to his death.

3.

Finally, MetLife relies on the remainder of the medical records as support for its conclusion that Mr. Coleman's cancer substantially contributed to his death. For example, the records reveal that Mr. Coleman was 86 years old, in hospice care, had "do not resuscitate" instructions in place, was frail, had jaundice, had "severely poor bone stock," had poor mobility, suffered from dementia, had a "significant history of anemia and three cardiovascular events," was not a surgical candidate due to "multiple comorbidities," and was generally described as "end-of-life." See [D.E. 33] 3. He also had thrombocytopenia. [D.E. 25-3] 121; AR 221. But nowhere do either MetLife or the record link these conditions to Mr. Coleman's cancer, which was the preexisting condition MetLife relied upon to deny Linda's claim. MetLife could not have reasonably relied upon this plethora of health issues not shown to be related to Mr. Coleman's cancer as evidence that his cancer substantially contributed to his death. Nor will the court now consider them as alternative grounds for finding that Mr. Coleman's preexisting conditions triggered the exclusion. See Solomon, 2017 WL 2695191, at *5; Hall, 259 F. App'x at 593 ("The statutory and regulatory text and the case law demand that judicial review take into account only reasons for an adverse benefits determination offered in the initial denial notice, because these are the only rationales on which a claimant might have arguably been given a 'full and fair' opportunity to respond during the administrative process."); see also Spradley v. Owens-Ill. Hourly Emps. Welfare Ben. Plan, 686 F.3d 1135, 1140 (10th Cir. 2012) ("Thus, the federal courts will consider only those rationales that were specifically articulated in the administrative record as the basis for denying a claim. The reason for this rule is apparent: we will

19

not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation." (alteration, citations, and quotations omitted)).

In sum, the record does not support MetLife's denial of benefits. Any denial required a finding that Mr. Coleman's cancer substantially contributed to his death. Yet the record contains no indication that Mr. Coleman's cancer contributed to his death in any quantifiable or substantial way. The record reveals at most that Mr. Coleman's cancer or overall frailty resulted in a predisposition or susceptibility to suffering an adverse outcome from a fall; any causal relationship is a "mere relationship of undetermined degree." As a different district court has said when applying the Adkins test,

> Considering the evidence in the administrative record, the Court agrees with Plaintiffs that the level of contribution of [the decedent's] preexisting conditions to his death has not been quantified. As noted earlier, "a mere relationship of undetermined degree" between decedent's predisposition and his or her death is not sufficient in this circuit to defeat accidental death coverage. The record in this case contains only unquantified statements as to causation. In its appeal denial letter, Defendant stated that there was no coverage because "[the decedent's] death was contributed to by his pneumonia and sleep apnea." Defendant did not state that the death was "substantially contributed to" by any conditions—only that it was "contributed to" by pneumonia and sleep apnea as opined by Fochtman. Under the law of this circuit, this is not an appropriate reason for denying coverage but instead is a statement of "a mere relationship of undetermined degree." And, the Court cannot discern from the record evidence any means of determining the degree of the causal relationship. Therefore, the denial of accidental death benefits cannot be upheld on this basis.

Towers ex rel. Verderosa, 2011 WL 3752734, at *6 (citation omitted). This conclusion holds true here. Thus, this factor weighs in favor of concluding that MetLife abused its discretion.

B.

The next factor focuses on whether the decisionmaking process was reasoned and principled. MetLife contends that its decisonmaking process was reasoned and principled because it consulted

with a medical professional, provided Linda an opportunity to appeal, notified Linda and her counsel of MetLife's decisions, and provided subsequent review after appeal, which it was not required to do. [D.E. 26] 16.

Here, MetLife failed to solicit the information needed to make the required finding that Mr. Coleman's cancer substantially contributed to his death. Under Adkins, MetLife could not have properly denied Linda benefits without concluding that Mr. Coleman's cancer substantially contributed to his death. Even though Linda's counsel notified MetLife that she disputed MetLife's denial of benefits with Adkins as her basis, MetLife never asked Dr. Bailey whether he had any evidence that Mr. Coleman's cancer substantially contributed to his death.

MetLife's consideration of Linda's evidence also bears on the process inquiry because MetLife's denial letters mischaracterized Linda's evidence. In Linda's appeal letter, she stated Dr. Abbott's opinion that Dr. Abbott had listed "metastatic prostate cancer" in the box labeled "other significant conditions contributing to death" "only because decreased mobility due to prostate cancer may have contributed to Mr. Coleman's accidental fall; however, the prostate cancer was not the 'Immediate Cause' of death." [D.E. 25-3] 118; AR 218. In the Second Denial Letter, MetLife recharacterized Dr. Abbott's statement in a manner not supported by the statement itself: "Our decision remains unchanged. As stated above, the exclusion would apply since the death was caused or contributed to by prostate cancer as verified by Dr. Abbott." [D.E. 25-3] 284–85; AR 384–85. Dr. Abbott did not "verify" that the death was caused or contributed to by Mr. Coleman's cancer. Instead, she implicitly said the opposite by clarifying that she listed the cancer only because it may have contributed to the fall.

After receiving the Second Denial Letter, Linda submitted an affidavit from Dr. Abbott and requested reconsideration of MetLife's denial. That affidavit essentially repeated Dr. Abbott's

21

earlier statements: "I listed 'metastatic prostate cancer' in this box only because decreased mobility and/or general deconditioned status due to the prostate cancer may have contributed to the accidental fall." [D.E. 25-3] 289–90; AR 389–90. In its Third Denial Letter, MetLife said that "Dr. Sarah Abbot [sic] confirmed that while the cancer was not the immediate cause of the loss, it did contribute to the fall and to the passing of the decedent." [D.E. 25-3] 304–05; AR 404–05. Dr. Abbott did not say that the cancer "did" contribute to the fall; she said it "may" have contributed to the fall. And nowhere did she say that the cancer contributed to Mr. Coleman's passing. Cf. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."); Solomon, 2017 WL 2695191, at *5 (same); Williams v. Metro. Life Ins. Co., 609 F.3d 622, 634 (4th Cir. 2010) (same).

The Second Denial Letter also mischaracterized the contents of Dr. Abbott's Report of Examination—a four-page, in-depth report completed the day after Mr. Coleman's death. See [D.E. 25-3] 118–21; AR 218–21. MetLife's Second Denial Letter says:

> You are also appealing on the basis of Dr. Sara Abbott's Report of Investigation. Dr. Abbott stated she listed complications of blunt force head and hip injuries as the immediate cause of death because the injuries form [sic] the accidental fall were the immediate precipitating event or condition causing his death. She then listed metastatic prostate cancer as a significant condition because decreased mobility due to prostate cancer may have contributed to William's accidental fall but was not the immediate cause of death.

[D.E. 25-3] 284–85; AR 384–85. As stated in Linda's appeal letter, Dr. Abbott's explanations referenced in the Second Denial Letter came from telephone conversations with Linda's counsel, not from the Report of Investigation. [D.E. 25-3] 111; AR 211. The Report of Investigation does not mention cancer as a cause of death. Under "probable cause of death," Dr. Abbott listed "complications of blunt force head and hip injuries due to fall from standing." See [D.E. 25-3] 118;

22

AR 218. The report also has a line dedicated to "contributing conditions" under the heading "probable cause of death," a line Dr. Abbott left blank. Id. Mr. Coleman's cancer was only listed in a section labeled "medical history." Id. Given MetLife's mischaracterization of the report's contents, it is unclear whether MetLife read the report closely and accounted for it in the decisonmaking process. Moreover, Metlife did not consider Dr. Abbott's subsequent explanation of his earlier report. See Jani, 209 F. App'x at 314 ("Similarly, a plan fiduciary abuses its discretion by crediting a doctor's earlier, incomplete evaluation but ignoring the same doctor's later, more comprehensive opinion."); Donovan, 462 F.3d at 329; see also Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 118 (2008) ("And the court furthermore observed that MetLife had emphasized a certain medical report that favored a denial of benefits, had deemphasized certain other reports that suggested a contrary conclusion . . . ."); Helton, 709 F.3d at 359 ("While an administrator has the authority to weigh conflicting pieces of evidence, it abuses its discretion when it fails to address conflicting evidence.").

Finally, MetLife also used Dr. Abbott's testimony to offer a new rationale for denying the claim. In its Third Denial Letter MetLife asserted that it was denying the claim because the cancer made Mr. Coleman more likely to fall. [D.E. 25-3] 304; AR 404. Relying on this new rationale to deny the claim contravenes ERISA's implementing regulations that the claim administrator provide sufficient notice of the precise reason for a denial. See Hall, 259 F. App'x at 592–94. The rationale is also not a basis for denying a claim under the specific language used in the exclusion, which provides that preexisting conditions causing or contributing to the loss, not the accident, trigger the exclusion. [D.E. 25-1] 108–09; AR 532–33 ("No payment will be made for any Loss if it results from or is contributed to by" a preexisting disease); see Ferguson, 3 F. Supp. 3d at 482–87.

Here, the record shows that MetLife's decisionmaking process was not reasoned and

principled. See Solomon, 2017 WL 2695191, at *5. MetLife failed to solicit the information needed to determine whether Mr. Coleman's cancer substantially contributed to his death, mischaracterized Linda's evidence in a self-serving manner, apparently did not address a report by the medical examiner that undercut MetLife's position, and for the first time in its Third Denial Letter offered a new rationale for denying coverage that was insufficient under the Plan's plain language. Thus, this factor weighs in favor of concluding that MetLife abused its discretion.

## C.

MetLife's conflict of interest also weighs in favor of finding that it abused its discretion. A structural conflict of interest exists when the insurance company "served as both administrator with discretionary authority to determine claims and insurer with responsibility of paying the claims." Carden v. Aetna Life Ins. Co., 559 F.3d 256, 260 (4th Cir. 2009); see Glenn, 554 U.S. at 112–15.[2] MetLife concedes that it was operating under such a conflict. A conflict like the one in this case "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision." Glenn, 554 U.S. at 117. The question is whether the facts suggest that Metlife was "inherently biased in making its decision." Williams, 609 F.3d at 632. On the other hand, "[i]t should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." Glenn, 554 U.S. at 117.

MetLife cites no steps it took to reduce any potential bias and to promote accuracy. Instead,

---

[2] Before the Court's decision in Glenn, the Fourth Circuit permitted reviewing courts to use an administrator's conflict of interest to reduce the deference given to the administrator's decision. See Booth, 201 F.3d at 343 n.2. The Fourth Circuit interpreted Glenn as preventing reviewing courts from accounting for the conflict of interest in this way. See Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 358–59 (4th Cir. 2008).

the circumstances suggest a likelihood that the conflict motivated MetLife's handling of the claim. As noted, MetLife mischaracterized Linda's evidence in a self-serving manner, used it to offer a new rationale for denying benefits not supported by the Plan's terms, and failed to address the medical examiner's report that left "contributing causes" blank. MetLife also misstated Dr. Bailey's role. In its Second Denial Letter, which it issued after soliciting Dr. Bailey's opinions, MetLife relies on some of his rationales but never discloses the source. When, in its Third Denial Letter, MetLife disclosed Dr. Bailey's role, MetLife claimed that it "obtained an independent expert medical opinion on the claim," when in fact Dr. Bailey was an in-house doctor for MetLife. These actions, taken while MetLife operated under a conflict of interest, support finding an abuse of discretion. See Glenn, 554 U.S. at 118; Helton, 709 F.3d at 359.

"Where an ERISA administrator rejects a claim to benefits on the strength of substantial evidence, careful and coherent reasoning, faithful adherence to the letter of ERISA and the language in the plan, and a fair and searching process, there can be no abuse of discretion—even if another, and arguably a better, decision-maker might have come to a different, and arguably a better, result." Evans, 514 F.3d at 325–26. However, MetLife's decision to deny benefits due under the AD&D policy was unreasonable, was not supported by substantial evidence, and did not result from a deliberate, principled decisionmaking process. Thus, MetLife abused its discretion in denying plaintiff's claim.

## D.

Having determined that MetLife abused its discretion in denying Linda's claim, the court addresses the remedy. Linda asks that the court order MetLife to pay her the proceeds due under the AD&D policy. MetLife did not request that the court remand the case for new proceedings should the court determine that MetLife abused its discretion. Although MetLife did not ask that the court

remand the case to MetLife for reconsideration, the court recognizes it has discretion to do so. <u>See,</u> <u>e.g., Helton,</u> 709 F.3d at 359; <u>Elliott v. Sara Lee Corp.,</u> 190 F.3d 601, 609 (4th Cir. 1999).

As a general rule, "remand should be used sparingly" when a court determines that an insurer/adjudicator abused its discretion. <u>Champion,</u> 550 F.3d at 362 (quotation omitted). Indeed, "remand is not required, particularly in cases in which evidence shows that the administrator abused its discretion." <u>Helton,</u> 709 F.3d at 360; <u>see id.</u> (discussing cases). Remand may nonetheless be preferable in certain circumstances, none of which apply here.

First, "[i]f the court believes the administrator lacked adequate evidence on which to base a decision, the proper course is to remand to the trustees for a new determination, not to bring additional evidence before the district court." <u>Elliott,</u> 190 F.3d at 609 (alteration and quotation omitted); <u>see Gorski v. ITT Long Term Disability Plan for Salaried Emps.,</u> 314 F. App'x 540, 548 (4th Cir. 2008) (per curiam) (unpublished). Neither party claims that the record was inadequate. Although the record is inadequate in the sense that it does not support MetLife's decision, it is not inadequate in the sense that MetLife lacked sufficient materials from which to reach a decision at all. Second, "[t]he district court may also exercise its discretion to remand a claim where there are multiple issues and little evidentiary record to review." <u>Elliott,</u> 190 F.3d at 609 (quotation omitted). This factor does not justify remand in this case. The record is voluminous, and the core inquiry focuses on a single issue: whether Mr. Coleman's cancer substantially contributed to his death. Third, "where the plan administrator has failed to comply with ERISA's procedural guidelines and the plaintiff/participant has preserved his objection to the plan administrator's noncompliance, the proper course of action for the court is remand to the plan administrator for a full and fair review." <u>Weaver v. Phoenix Home Life Mut. Ins. Co.,</u> 990 F.2d 154, 159 (4th Cir. 1993) (quotation omitted). Linda does not contend that MetLife failed to comply with ERISA's procedural requirements.

26

Other considerations also weigh against remand. MetLife made its decision in a manner demonstrating that its conflict of interest likely influenced its decisionmaking process and conclusions. Moreover, MetLife did not ask the court to remand the case should the court hold that MetLife abused its discretion. Instead, MetLife argued that the current record provides substantial evidence for the conclusion that Mr. Coleman's cancer substantially contributed to his death. On this record, the court declines to remand the case to MetLife. Thus, the court awards plaintiff the benefits due under the AD&D policy.

### E.

Linda also seeks attorneys' fees. "In an ERISA action, a district court may, in its discretion, award costs and reasonable attorneys' fees to either party under 29 U.S.C. § 1132(g)(1), so long as that party has achieved 'some degree of success on the merits.'" Williams, 609 F.3d at 634 (quoting Hardt v. Reliance Std. Life Ins. Co., 560 U.S. 242, 255 (2010)). The first step in the analysis is determining whether Linda achieved "some degree of success on the merits." Id. A grant of a party's summary-judgment motion and awarding benefits satisfies this requirement. Id. At the second step of the analysis the court should consider five non-exclusive, "general guidelines":

> (1) degree of opposing parties' culpability or bad faith;
> (2) ability of opposing parties to satisfy an award of attorneys' fees;
> (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;
> (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and
> (5) the relative merits of the parties' positions.

Id. at 635. Because the court finds that there was a good-faith dispute over Linda's entitlement to benefits, the court denies Linda's request for attorneys' fees.

V.

In sum, the court GRANTS plaintiff's motion for summary judgment [D.E. 27] and DENIES

MetLife's motion for summary judgment [D.E. 24]. The court directs MetLife to award plaintiff the

benefits due to her under the accidental death and dismemberment policy. The clerk shall close the

case.

SO ORDERED. This 26 day of June 2017.

JAMES C. DEVER III
Chief United States District Judge